**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **[UNDER SEAL],** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **PLAINTIFF,** | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| **[UNDER SEAL],** | ) | **FILED UNDER SEAL** |
| | ) | **PURSUANT TO** |
| **DEFENDANT.** | ) | **31 U.S.C. § 3730(b)(2)** |
| | ) | |

**COMPLAINT**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

———————————————————————x

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA; and | ) Civil No. **[CIVIL ACTION NO.]** |
| | ) |
| | ) **FILED UNDER SEAL** |
| THE STATES OF ARKANSAS, CALIFORNIA, | ) **PURSUANT TO** |
| COLORADO, CONNECTICUT, DELAWARE, | ) **31 U.S.C. § 3730(b)(2)** |
| FLORIDA, GEORGIA, HAWAII, ILLINOIS, | ) |
| INDIANA, LOUISIANA, MARYLAND, | ) **COMPLAINT** |
| MASSACHUSETTS, MICHIGAN, | ) |
| MINNESOTA, MONTANA, NEVADA, NEW | ) FOR VIOLATIONS OF THE FEDERAL |
| HAMPSHIRE, NEW JERSEY, NEW MEXICO, | ) FALSE CLAIMS ACT [31 U.S.C. § 3729 |
| NEW YORK, NORTH CAROLINA, | ) *et seq.*]; ARKANSAS FRAUD FALSE |
| OKLAHOMA, RHODE ISLAND, TENNESSEE, | ) CLAIMS ACT [§ 20-77-902 *et seq.*]; |
| TEXAS, VIRGINA, WASHINGTON, | ) CALIFORNIA FALSE CLAIMS ACT |
| WISCONSIN, and THE DISTRICT OF | ) [Cal. Govt. Code § 12650 *et seq.*]; |
| COLUMBIA, | ) DELAWARE FALSE CLAIMS AND |
| | ) FALSE REPORTING ACT [6 Del. C. |
| *ex rel.* VIVIAN RICE, | ) § 1201]; DISTRICT   OF COLUMBIA |
| | ) PROCUREMENT REFORM |
| Plaintiff, | ) AMENDMENT ACT [2-308.13 *et seq.*]; |
| | ) FLORIDA FALSE CLAIMS ACT [Fla. |
| vs. | ) Stat. Ann. § 68.081 *et seq.*]; GEORGIA |
| | ) FALSE MEDICAID CLAIMS ACT [Ga. |
| SMITH & NEPHEW, INC., | ) Code Ann. § 49-4-168 *et seq.*]; HAWAII |
| | ) FALSE CLAIMS ACT [Haw. Rev. Stat. |
| Defendant. | ) § 661-21 *et seq.*]; ILLINOIS |
| | ) WHISTLEBLOWER REWARD AND |
| | ) PROTECTION ACT [740 Ill. Comp. Stat. |
| | ) § 175 *et seq.*]; INDIANA FALSE |
| | ) CLAIMS AND WHISTLEBLOWER |
| | ) PROTECTION ACT [Ind. Code Ann. § 5- |
| | ) 11-5.5-1 *et seq.*]; LOUISIANA MEDICAL |
| | ) ASSISTANCE PROGRAM INTEGRITY |
| | ) LAW [La. Rev. Stat. § 46:437.1 *et seq.*]; |
| | ) MASSACHUSETTS FALSE CLAIMS |
| | ) LAW [Mass Gen Laws ch.12 § 5 *et seq.*]; |
| | ) MICHIGAN MEDICAID FALSE |
| | ) CLAIMS ACT [Mich. Comp. Laws. |
| | ) § 400.601 *et seq.*]; MONTANA FALSE |
| | ) CLAIMS ACT [Mont. Code Ann. § 17-8- |
| | ) 401 *et seq.*]; NEVADA FALSE CLAIMS |
| | ) ACT [Nev. Rev. Stat. Ann. § 357.010 *et* |

) *seq.*]; NEW HAMPSHIRE FALSE
) CLAIMS ACT [N.H. Rev. Stat. Ann.
) § 167:61 *et seq.*]; NEW JERSEY FALSE
) CLAIMS ACT, N.J. Stat. § 2A:32C-1, *et*
) *seq.*; NEW MEXICO MEDICAID FALSE
) CLAIMS ACT [N.M. Stat Ann. § 27-2F-1
) *et seq.*]; NEW YORK FALSE CLAIMS
) ACT [N.Y. State Fin. § 187, *et seq.*];
) OKLAHOMA MEDICAID FALSE
) CLAIMS ACT [Okla. Stat. tit. 63 § 5053 *et*
) *seq.*]; RHODE ISLAND FALSE CLAIMS
) ACT [R.I. Gen. Laws. § 9-1.1-1 *et seq.*];
) TENNESSEE FALSE CLAIMS ACT
) AND TENNESSEE MEDICAID FALSE
) CLAIMS ACT [Tenn. Code Ann. § 4-18-
) 101 *et seq.* and § 71-5-181 *et seq.*];
) TEXAS MEDICAID FRAUD
) PREVENTION LAW [Tex. Hum. Res.
) Code Ann. § 36.001 *et seq.*]; VIRGINIA
) FRAUD AGAINST TAXPAYERS ACT
) [Va. Code Ann. § 8.01-216.1 *et seq.*];
) WISCONSIN FALSE CLAIMS FOR
) MEDICAL ASSISTANCE ACT [Wis. Stat
) § 20.931 *et seq.*]; COLORADO
) MEDICAID FALSE CLAIMS ACT
) [Colorado Revised Stat. § 25.5-4-303.5.
) *et seq.*]; CONNECICUT FALSE
) CLAIMS ACT FOR MEDICAL
) ASSITANCE PROGRAMS [Connecticut
) General Stat. §17b-301b. *et seq.*];
) MARYLAND MEDICAID FALSE
) CLAIMS AGAINST STATE HEALTH
) PLANS AND STATE HEALTH
) PROGRAMS ACT [Annotated Code of
) Maryland § 2-601 *et seq.*];
) WASHINGTON MEDICAID FRAUD
) ACT [Washington Revised Code § 74 66-
) 005 *et seq.*]; NORTH CAROLINA
) FALSE CLAIMS ACT [North Carolina
) General Stat. § 1-605 et seq.];
) MINNESOTA FALSE CLAIMS ACT
) [Minnesota Stat. § 15C.02 *et seq.*]

_____x

## **COMPLAINT**

1.      Plaintiff and *qui tam* relator Vivian Rice (Plaintiff-Relator), through her attorneys Sanford Heisler Kimpel, LLP and the Law Offices of Grant E. Morris, for their Complaint against Smith & Nephew, Inc. (hereinafter "Defendant," "Smith & Nephew," or "Company"), allege as follows:

2.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendant Smith & Nephew (S&N) and/or its agents and employees in violation of the Federal False Claims Act, 31 U.S.C. §3729 *et seq.*, ("the FCA" or "the Act").

3.      This *qui tam* case is brought against Defendant for conducting a fraudulent inducement campaign that foreseeably caused and continues to cause false or fraudulent claims, *inter alia*, in the promotion of Defendant's medical devices.  As a direct result of Defendant's improper practices, the federal Treasury has been damaged in a substantial amount yet to be determined.

4.      In order to gain a competitive edge over other medical device manufacturers and increase sales and revenue, Defendant S&N initiated a coordinated nationwide sales campaign, entitled "Voice of the Customer" Initiative, to entice and induce doctors to purchase and exclusively use S&N products.

5.      This national campaign involved not only sharpening sales representatives' marketing and promotional pitches, but also paying illegal kickbacks to physicians under the guise of compensation for survey completion.  Under this version of the popular VoC program, Defendant paid surgeons who used its products grossly above market rate to complete alleged feedback surveys.

6.      Specifically, S&N was able to increase its market share by rewarding and bribing doctors who were "S&N friendly" surgeons, those that agreed to start and/or continue using S&N products.

7.      As a result of this illegal kickback scheme, which bribed doctors to use S&N devices, a substantial number of Medicare and Medicaid patients have been given S&N products in lieu of a competitor's product.   As a result, government healthcare programs have incurred substantially increased costs.

## I.      PARTIES

8.      Ms. Rice is a resident of Tampa, Florida.  She was employed by Smith & Nephew from 2009 to 2014 as the assistant to the Director of Sales.  During her six years at S&N, Ms. Rice's responsibilities included administrative support to the Southwest Florida District Sales office, including the Director's assistant and staff, comprised of sixteen Recon and Trauma sales representatives.   Ms. Rice has personal knowledge of Smith & Nephew's practice of offering bribes to doctors under the guise of feedback surveys as part of the VoC program.

9.      Defendant Smith & Nephew, Inc. is a British medical devices company headquartered in London and active internationally.  Smith & Nephew is a constituent of the FTSE 100 Index, a share index of the 100 most capitalized companies on the London Stock Exchange.  According to Smith & Nephew's website, Smith & Nephew has a presence in more than ninety countries and generates annual sales of $4.3 billion. The company employs over 11,000 people.  Smith & Nephew is a leader in Orthopaedic Reconstruction, Advanced Wound Management, Sports Medicine, and Trauma Extremities and Fixation.   Smith & Nephew's orthopaedics market segment is located in Memphis, Tennessee.  Smith & Nephew has been violating the False Claims Act by its persistent and nationwide violation of the Anti-Kickback

Statute ("AKS") through its payments to surgeons to induce them to use Smith & Nephew's products, under the guise of feedback surveys.

## II.   JURISDICTION AND VENUE

10.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.   It also has subject-matter jurisdiction pursuant to 31 U.S.C. §3732, which specifically provides for jurisdiction over actions brought under the False Claims Act, 31 U.S.C. §§3729 and 3730.

11.    This Court has personal jurisdiction over Defendant Smith & Nephew pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because Defendant has at least minimum contacts with the United States.   Moreover, Smith & Nephew transacts – or has transacted – business in the District of Maryland.

12.    Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because Defendant can be found in and transacts – or has transacted – business in the District of Maryland.

13.    There has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.   *See* 31 U.S.C. § 3730(e)(4).   Assuming there had been such a disclosure, Relator Rice is an "original source" under the FCA and parallel provisions of the State False Claims Acts.   *Id*.

## III. BACKGROUND

### A.  Many Companies Use the "Voice of the Customer" Program to Obtain Valuable Information and Market Research.

14.    "Voice of the Customer" (VoC) describes a market research technique of capturing customers' feedback about their experiences with products or services.   This marketing approach became popular in 1993. These VoC programs attempt to identify "a complete set of customer

3

wants and needs; expressed in the customer's own language; organized the way the customer thinks about, uses and interacts with the product and service; and prioritized by the customer in terms of both importance and performance." Ex. A.  To do this, companies first use various survey techniques to canvass the attitudes, needs, and complaints of their customers.

15.     Marketing experts recognize VoC programs as one of the most significant strategic investments that a company can make and the VoC market is growing rapidly.  It typically consists of qualitative and quantitative market research steps, Ex. B, including not only classic surveys but also focus groups; individual interviews; social media monitoring; speech analytics; web analytics; and more.

16.     Companies generally conduct VoC initiatives at the start of any new product, process, or service in order to better understand the customer's wants and needs.  Ex. C.   The results inform companies and create a solid basis for design and marketing decisions from concept development through product launch.  Ex. C.

17.     VoC initiatives are commonly used to find out what is most important to customers, what their basic needs are, and what makes them excited about both the current product and potential new offerings and enhancements.  This consists of identifying who the customer types are; the demographic characteristics to target; formulating the customer questions; fielding the survey; collecting the data and summarizing the results.  Ex. D.

18.     Medical device companies, like the Defendant, commonly utilize VoC as a marketing strategy to achieve legitimate goals of product research and customer satisfaction. Publicly available references indicate that medical device companies usually compensate doctors for their time to complete these market surveys, and the typical honorarium ranges between $25.00 and $250.00.  Ex. E, F.

19.     Such information gathering is collected from past, present, and potential future customers. Ex. D. After the VoC data has been collected, customer feedback is then translated into product specifications and process designs. Ex. D.

**B. Smith & Nephew's Voice of the Customer Initiative Differs Significantly From the Standard and is Simply a Cover to Funnel Monetary Rewards to Doctors that Use its Products.**

20.     Since at least 2013 and continuing through the present, Smith & Nephew has utilized VoC programs across the country as a cloak to illegally pay doctors to exclusively use S&N products. The products that were involved in VoC, include but are not limited to, the (1) Redapt hip revision; (2) Journey II BCS knee; (3) Visionaire knee; (4) Polar Stem; and (5) Acufex Director Elite, a drill guide system.

21.     S&N claims to employ VoC to track customer (internal and external) satisfaction improvement year on year by "randomly" choosing surgeons and selecting products for which they would like additional feedback. Ex. G. To do this, the marketing department contacts the targeted surgeons with a proposal to commit to using certain S&N surgical equipment in a specified number of surgeries, after which the doctors are required to fill out a survey regarding the relevant products. S&N then compensates the doctors for completing the survey at a rate that far exceeds the typical honorarium of $25.00 to $250.00.

22.     From the outset, the S&N VoC plan was crafted to expand the number of doctors using S&N products. Instead of reaching out to current customers, as one would expect in a legitimate VoC program, S&N targeted doctors who were not regular users of S&N medical devices. S&N employees were instructed to provide S&N with a list of surgeons to target for the program and to

focus on doctors who regularly used medical devices manufactured by competitors like Zimmer and DePuy.

23.     To make the program appear legitimate, S&N sent e-mails to employees requesting that they target established and potential customers.   Ex. H, I.   In reality, S&N demanded that employees focus on surgeons who used products of competing companies, such as Zimmer and Depuy, not "S&N friendly surgeons."

24.      In contrast to the traditional VoC programs, which primarily question past and present customers to attain a broad review, S&N deliberately targeted surgeons that were not using S&N products in hopes of converting them to S&N users.

25.     To reward and induce these new customers to continue to use Smith & Nephew products, Defendant Smith & Nephew paid the doctors anywhere between $300.00 and $3,000.00 for completion of the survey, an amount that unreasonably exceeds market value by thousands of dollars.

26.      While compensating doctors for the completion of such surveys for research purposes is permissible, compensating them at a level so far above the market standard for the purpose of bribing them to use S&N products exclusively under the guise of a bogus study is considered a kickback.

27.     To hide the illegal nature of the program, S&N supervisors gave special instructions to the employees about what they could and could not put into writing. If the employees deviated from these instructions, they were reprimanded.  For example, in November 2013, there was a telephone conference with Mark Wise, a supervisor of Relator's boss, who told employees to be very careful about what they put in writing, and that they "almost lost the whole VoC Initiative because someone sent an email stating how much business he'd gain based on that initiative."

This new business would be gained from targeting surgeons that were not using S&N products and converting them to S&N users.

28.     The statement of Mark Wise shows that S&N was trying to hide the fact that the true goal of the program was to increase business by making payments to new customers, not to obtain product feedback.

29.     On this call, Mr. Wise also stated how successful the program was when referencing the Polar stem, a product included in the VoC initiative.  It was clear that "success" meant increased product sales. The people that were on this call include: Steve Price (fellow Florida manager); Tom Troup  (fellow manager in Jacksonville, Florida); Bob McGrammery (Atlanta, Georgia); Chris Mason (manager in the Carolinas); Chip Parish (manager in Tennessee); and Ron Reagan (manager in the Carolinas).

30.     Numerous employees recognized the illegality of the program due to their continual compliance and AKS training put on by the legal team.

31.     Unlike the usual VoC program, S&N targeted new customers and paid in excess of the market rate to complete a survey that often took less than five minutes to complete. In addition, S&N also focused on products that had been on the market for an extended period of time when, generally, VoC initiatives are conducted at the start of any new product.  Ex. C.

32.     Surgeons that were targeted by the VoC Initiative include but are not limited to Dr. Alan Valadie (Bradenton, FL); Dr. Mark Umlas (Miami, FL), and Dr. Dean Cole (Orlando, FL); Dr. Kenneth Sands (Viera, FL).   The agreements between the surgeons and S&N are memorialized in writing.

33.     The surveys consist of twelve to fifteen questions.  Ex. I.  S&N claims that the surveys take approximately thirty minutes to complete but, in reality, doctors have been typically able to

finish the survey in three to five minutes.  S&N pays surgeons anywhere between $300.00 and $3,000.00 for completion of the survey, an amount that unreasonably exceeds market value by thousands of dollars.

34.     Such practices are not new to S&N. In September 2007, Smith & Nephew agreed to pay $28.9 million to settle criminal and civil allegations that it violated the Medicare, Medicaid, and anti-kickback laws, targeting corruption in the orthopedics market. There, and similar to the instant case, S&N was paying kickbacks to American surgeons to use its devices between 2002 and 2006.

35.     Again, in February 2012, S&N paid $9.4 million for improper payments funneled to Greek healthcare providers from 1998 to 2008 to induce them to buy Smith & Nephew products. S&N was told by the Department of Justice that it had to hire someone outside the company to monitor its implementation of corporate and compliance reforms. The company agreed to pay $22.2 million to resolve an investigation into possible violations of the Foreign Corrupt Practices Act and to hire a monitor.

36.     In direct violation of its agreement with the government, and in contravention of the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b),  S&N has continued to offer bribes to physicians in exchange for such medical providers' utilization of their products under the guise of compensation for completion of feedback surveys.

37.     Because compliance with the Anti-Kickback Statute is a condition of payment under a federally-funded health care program, claims for reimbursement for procedures performed by a physician who has received a kickback from Defendant are not eligible for reimbursement by Medicare.

38.     Accordingly, kickback-tainted claims for reimbursement are false claims within the meaning of the Federal False Claims Act.

39.     Relator is aware of approximately $8-9 million worth of new business brought into S&N by the VoC program, which included around eighty surgeons nationwide and led to at least 3,000 surgeries utilizing S&N products.  This new business came from doctors, who previously did not use S&N products, choosing to use S&N products over competitors due to the VoC bribes. This estimate is founded upon the fact that:

    a.  S&N charges approximately $5,000 for a knee replacement and $15,000 for a hip replacement, of which both procedures use S&N products that were part of the VoC program.

    b.  For the Redapt hip revision, Defendant paid at least twenty-eight surgeons to perform twelve surgeries each.  Approximately $3,000.00 was budgeted per surgeon, totaling $84,000 for all surgeons.

    c.  Similarly, for the Journey II BCS knee, Defendant paid thirty surgeons to perform at least thirty surgeries each.  There was approximately a $150,000 budget set aside for this, averaging $250.00 per survey.

    d.  For the Visionaire knee, Defendant paid twenty surgeons to perform twenty-five surgeries each.  There was approximately a $150,000 budget set aside for this, averaging $250.00 per survey.

    e.  For the Polar Stem, Defendant paid five surgeons to perform a specified number of surgeries and had a budget allotted per survey.

    f.  The products themselves appear to have been paid for by the hospitals at a premium price; they were not given away for free or at a discounted rate.  It is

9

unclear at this time whether the hospitals were later reimbursed by Medicare for the cost of the products themselves.

g. Hospitals were reimbursed by Medicare for the surgeries performed by the targeted surgeons with the "tainted" S&N products. Relator estimates that in her region of southwest Florida, about eighty percent of the surgeries covered by the VoC program were reimbursed by Medicare because of the high percentage of elderly citizens in the area and the fact that several of the products involved in the VoC program were used in hip and knee replacements, a common procedure for elderly patients. Relator further estimates that the national percentage of Medicare-reimbursable surgeries was likely lower but not less than forty percent.

40.    As a result of S&N's illegal kickback scheme, the taxpayers have been forced to bear the cost of excessive, unnecessary and unqualified medical care. At the same time, Medicare patients have been denied proper medical care, due to their physicians choosing products on the basis of bribes from S&N. As a result, the Medicare programs, along with other government healthcare programs, have incurred substantially increased costs.

## IV.    LEGAL AND REGULATORY FRAMEWORK

### A.    The False Claims Act

41.    The FCA was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act, Pub. L. 99-562, 100 Stat. 3153. After finding that federal program fraud was pervasive, Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses caused by frauds against the Government ("Government Funds"). The amendments were intended to create incentives for individuals with knowledge of Government Frauds to disclose information without fear of reprisals or Government

10

inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.

42.     The Act provides that any person who presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal Government.

43.     The Act allows any person having information about false or fraudulent claims ("Plaintiff-Relator") to bring an action for herself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of sixty days (without service on the defendant during that time).  Based on these provisions, qui tam Plaintiff-Relator Rice seeks through this action to recover damages and civil penalties arising from the Defendant's knowing fraud on the U.S. Government.

**B.     The Anti-Kickback Statute**

44.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), imposes criminal penalties on anyone who knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, or to purchase or order, or arrange for or recommend purchasing or ordering, any good, service or item for which payment may be made in whole or in part under a Federal health care program.  The AKS holds liable both the person paying and the person

accepting a kickback.   Unlawful remuneration includes any payment or other benefit made directly or indirectly, overtly or covertly, in cash or in kind, for referrals, subject to specific exclusions.  42 U.S.C. § 1395nn(h)(1)(B); 42 C.F.R. § 411.351.

45.     Compliance with the Anti-Kickback Statute is a condition of payment by Federal healthcare programs, including Medicare, and a claim for reimbursement from such programs for items or services furnished or arranged in return for a kickback is a false claim under the FCA. *See* 42 U.S.C. § 1320(a)-7b(g); *United States v. Omnicare, Inc.*, No. 07-cv-05777, 2013 U.S. Dist. LEXIS 102543, *27 (N.D. Ill. July 23, 2013).

46.     A 2010 clarifying amendment of the AKS provides that "a claim [to a Federal health-care program] that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the False Claims Act.  Patient Protection and Affordable Care Act, Pub. L. 111–148, § 6402, 124 Stat. 468, 759 (2010), codified at 42 U.S.C. § 1320a-7b(g).

47.     If even one purpose of remuneration is to induce referrals for covered items or services, such payment of remuneration violates the AKS.  In such circumstances, claims for Federal reimbursement arising from the referrals violate the FCA, even if other, legitimate purposes may be present.

V.     **GOVERNMENT HEALTHCARE PROGRAMS**

   A.     **Medicare**

48.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., known as the Medicare program.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426A. Medicare is administered by CMS, which is part of the Department of Health and Human Services.  The Medicare program

reimburses hospitals and  medical providers for certain costs for healthcare and services provided to program participants.

49.     For inpatient treatment, reimbursement to treating facilities (such as hospitals) is governed by Medicare Part A, 42 U.S.C. §§ 1395c-1395i-5. For outpatient treatment, reimbursement to health care providers (such as physicians) is governed by Medicare Part B, 42 U.S.C. §§ 1395j-1395w-5.

50.     The Medicare program is administered through the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").  At times relevant to the Complaint, CMS contracted with private contractors referred to as "fiscal intermediaries" and "carriers" to act as agents in receiving and paying claims submitted by health care providers.  42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 431.100.

### 1.     Medicare Payments to Hospitals

51.     Medicare pays hospitals different amounts for various services based, in part, on the setting (*e.g.,* inpatient or outpatient) where the services were performed.  Hospitals are generally reimbursed for inpatient services on a "per case" basis.  In other words, each inpatient hospitalization is assigned a Diagnosis Related Group ("DRG") based on the nature and severity of the patient's diagnosis and the services performed.  Medicare then pays the hospital a pre-determined reimbursement rate based on the DRG.  The pre-determined DRG reimbursement rate is paid to the hospital regardless of how long the patient is admitted or the number of services provided.

52.     DRGs are assigned to a case through a process called "grouping."  A "grouper" is a type of software that reviews various data related to the hospitalization (especially the patient's diagnosis and the procedures performed) to determine the appropriate DRG for the treatment.

53.     In most cases, the procedure performed by the hospital is one of the most significant, if not the determinative, data point affecting the DRG grouper's decision.   These procedures are classified and reported using the International Classification of Diseases, Ninth Revision, Clinical Modification ("ICD-9-CM") system, established by CMS and the National Center for Health Statistics.   These codes are commonly referred to as "ICD-9 procedure codes."

54.     Payments for hospitals in the outpatient setting also bundle items and services so that hospital providers are paid for the procedures performed, including the cost of equipment. Hospitals use APC Codes (Ambulatory Payment Classifications) to bill for costs associated with outpatient services.

### 2.     Medicare Payments to Physicians

55.     Physician services provided in conjunction with a procedure performed at a hospital (on either an inpatient or outpatient basis) are billed and reimbursed separately from the hospital's DRG or APC payment.

56.     Like hospital reimbursement, Medicare bases physician reimbursement on the assumption that similar types of procedures consume a similar amount of resources, and thus deserve similar reimbursement.     Accordingly, Medicare reimburses physicians based on standardized procedure codes – HCPCS and CPT codes, as described below.

57.     Each procedure code is assigned a weight or value (called a Resource Based Relative Value Unit or "RBRVU"), as determined by the Resource-Based Relative Value Scale ("RBRVS").   The payment level for any given procedure is then determined by multiplying the RBRVU value for the code times a conversion factor (which takes into account regional and other variable cost factors).

58.     The RBRVS system is based on the Healthcare Common Procedure Coding System (HCPCS).  HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal health care programs pay for services rendered to patients by attending physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render specific categories of medical care.  To ensure normalization of descriptions of medical care rendered and consistent compensation for similar work, both programs tie levels of reimbursement to standardized codes.

59.     Current Procedural Terminology ("CPT") codes are Level I HCPCS codes and are published and updated annually by the American Medical Association ("AMA").

60.     Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Anesthesiology," "Surgery,"   "Radiology," or general "Medicine") and the specific medical procedures commonly practiced by physicians and other health care professionals working in that field.

61.     The instructions that accompany the CPT manual direct providers "not [to] select a CPT code that merely approximates the service provided."  Rather, when none of the standard CPT codes provides an accurate description of the services provided or procedure performed, providers are instructed to "report the service using the appropriate unlisted procedure or service code" (*i.e.,* the special CPT codes provided for use when none of the standard CPT codes reasonably and adequately describe the specific procedure or service provided).

62.     Physicians typically submit claims for professional services on Form CMS-1500.  This claim form sets forth the diagnostic code describing the patient's presenting condition

and the procedure codes.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient…."

### 3.      Other Rules Governing Payments to Both Hospitals and Physicians

63.      In addition to compliance with other national or local coverage criteria, Medicare requires, as a condition of coverage, that services be reasonable and medically necessary.  *See* 42 U.S.C. § 1395y(a)(1)(A).  Providers must provide economical medical services, and only where medically necessary.  *See* 42 U.S.C. § 1320c-(a)(1).  Providers must provide evidence that the service is medically necessary and appropriate.  *See* 42 U.S.C. § 1320c-5(a)(3).  Providers must ensure that services provided are not substantially in excess of the needs of such patients.  *See* 42 U.S.C. § 1320a-7(b)(6)&(8).

64.      Federal law also specifically prohibits providers from making "any false statement or representation of a material fact in any application for any … payment under a Federal health care program."  *See* 42 U.S.C. § 1320-a-7b(a)(1).  Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to Medicare to disclose those omissions or errors to the Government.  *See* 42 U.S.C. § 1320-a-7b(a)(3).  The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program.  *See, e.g.*, 42 CFR §§ 1003.105, 1003.102(a)(1)-(2).

65.      Physicians may not bill Medicare for services provided by Clinicians or Sales Representatives. Because Clinicians and Sales Representatives employed by device manufacturers do not meet the definitions of either Provider or Supplier, *see* 42 C.F.R. 400.202, the services they provide are ineligible for payment under Medicare. *See* 42 C.F.R. 424.5(a)(ii)(2) ("The services must have been furnished by a provider, nonparticipating hospital, or supplier that was, at the time it furnished the services, qualified to have payment made for them.").

66.     Federal law requires that doctors who are enrolled in medical studies ("Investigators") "prepare and maintain adequate and accurate case histories," including case report forms ("CRF").   *See* 21 CFR 312.62(b).   The Company sponsoring the study is therefore prohibited from filling out the CFR. The reason for this requirement is that if the sponsor has access to the report forms they could "alter" the information contained therein to their own benefit, thereby tainting the study.

**B.  The Medicaid Program**

67.     Medicaid is a federal and state funded health program, benefiting "categorically eligible" people, who are mostly low-income individuals and families.   Like Medicare, it was created in 1965 pursuant to Title XIX of the Social Security Act.   Under Medicaid, participating states administer state Medicaid programs that subsidize health care coverage for eligible residents.   The individual state programs reimburse medical providers and hospitals for services rendered to program participants.   The states receive federal funds to pay for Medicaid services.

68.     Each state's Medicaid program must cover hospital services, 42 U.S.C. § 1396(a)(10(A), 42 U.S.C. § 1396d(a)(1-)(2), and uses a cost reporting method similar to that used under Medicare.

69.     Each physician who participates in the Medicaid program must sign a Medicaid provider agreement with his or her state.   Although there are variations in the agreements among the states, all states require the prospective Medicaid provider to agree that he or she will comply with all Medicaid requirements, including the fraud and abuse provisions.

70.     Similar to Medicare coverage requirements, medical services must be reasonable and medically necessary in order to be subsidized by Medicaid.   Claims for reimbursement presented by a provider to a state Medicaid program are subject to terms of certification.   These

17

terms require that the medical services for which the claims are sought were provided in accordance with applicable federal and state laws.

### 1. CMS TRANSMITTALS ON FRAUD

71.     The Centers for Medicare and Medicaid services (CMS) is a federal agency, which administers Medicare and Medicaid.  CMS has issued guidelines on fraud, including kickbacks. These are contained in Chapter 1 transmittals 20.3, 20.3.1, and 20.3.2 of the CMS Medicare regulations.

72.     Transmittal 20.3 addresses fraud and abuse of the Medicare program generally.  It states:

- Providers and suppliers have an obligation, under law, to conform to the requirements of the Medicare program. Fraud and abuse committed against the program may be prosecuted under various provisions of the United States Code and could result in the imposition of restitution, fines, and, in some instances, imprisonment. In addition, there is also a range of administrative sanctions (such as exclusion from participation in the program) and civil monetary penalties that may be imposed when facts and circumstances warrant such action.

73.     Transmittal 20.3.1 defines fraud as "making false statements or representations of material facts in order to obtain some benefit or payment for which no entitlement would otherwise exist."  Fraud, the transmittal states, may be committed either for the person's own benefit or for the benefit of some other party. In order to prove that fraud has been committed against the Government, it is necessary to prove that fraudulent acts were performed knowingly, willfully, and intentionally.

74.     Transmittal 20.3.1 includes the following example of fraud:

• Offering, paying, soliciting, or receiving bribes, kickbacks, or rebates, directly or indirectly, in cash or in kind, in order to induce referrals of patients or the purchase of goods or services that may be paid for by the Medicare program.

75.     Smith & Nephew has performed and continued to perform all of the above type of fraudulent activity.

**C.  Other Government-Funded Health Programs**

76.     In addition to Medicare, the federal government reimburses a portion of the cost of medical services under several other federal health care programs, including, without limitation, programs administered by the Department of Defense (the "DOD"), the Department of Veteran's Affairs (the "VA"), and the Office of Personnel Management (the "OPM").

77.     The DOD administers TRICARE (formerly CHAMPUS), a health care program covering individuals and dependents affiliated with the armed forces.  The VA administers its own health program, along with CHAMPVA (a shared cost program), covering families of veterans. OPM administers the Federal Employee Health Benefit Program, a health insurance program covering federal employees, retirees, and survivors.

**VI.  ALLEGATIONS**

**A.     DEFENDANT   SMITH   &   NEPHEW   PROVIDES   ILLEGAL REMUNERATION (KICKBACKS) TO DOCTORS IN ORDER TO INDUCE THEM TO USE SMITH & NEPHEW'S PRODUCTS EXCLUSIVELY**

78.     Since at least 2013 and continuing through the present, Smith & Nephew has utilized VoC programs as a cloak to illegally pay doctors to exclusively use S&N products.  The products that were involved in VoC, include but are not limited to, the (1) Redapt hip revision; (2) Journey II BCS knee; (3) Visionaire knee; (4) Polar Stem; and (5) Acufex Director Elite, a drill guide system.

79.     Transmittal 20.3.1 of the CMS regulations states that one example of fraud is: "Offering, paying, soliciting, or receiving bribes, kickbacks, or rebates, directly or indirectly, in cash or in kind, in order to induce referrals of patients or the purchase of goods or services that may be paid for by the Medicare program."  Defendant engaged in this exact type of fraud for several years and continues to do so presently.

**1.     Defendant Provides Improper Kickbacks in the Form of Bogus VoC Agreements with Doctors to Induce Them to Use Smith & Nephew Products, exclusively.**

80.     S&N claims to employ VoC to track customer (internal and external) satisfaction improvement year on year by "randomly" choosing surgeons and selecting products for which they would like additional feedback.  Ex. G.  This is done by the marketing department contacting the targeted surgeons with a proposal to commit to using certain S&N surgical equipment in a specified number of surgeries, filling out a survey regarding the relevant products, and receiving compensation for their time.

81.     S&N strategized to include 500 surgeons in the VoC Initiative.  Employees were instructed to provide S&N with a list of surgeons to target for the program.  To make the program appear legitimate, S&N sent e-mails to employees requesting that they target established and potential customers.  Ex. H, I.  In reality, S&N demanded that employees focus on surgeons who used products of competing companies, such as Zimmer and Depuy, not "S&N friendly surgeons."

82.     In contrast to the traditional VoC programs, which question past, present and potential future customers to attain a broad review, S&N focuses on deliberately targeting surgeons that are not using S&N products in hopes of converting them to S&N users.  Through these survey agreements, S&N induces doctors to use S&N products exclusively and pays them for their loyalty under the guise of compensation for survey completion. While compensating

doctors for the completion of such surveys for research purposes is permissible, compensating them at a level so far above the market standard for the purpose of bribing them to use S&N products exclusively under the guise of a bogus study is considered a kickback.

83.     To hide the illegal nature of the program, S&N supervisors gave special instructions to the employees about what they could and could not put into writing. If the employees deviated from these instructions, they were reprimanded.  For example, in November 2013, there was a telephone conference with Mark Wise, a supervisor of Relator's boss, who told employees to be very careful about what they put in writing, and that they "almost lost the whole VoC Initiative because someone sent an email stating how much business he'd gain based on that initiative."  This new business would be gained from targeting surgeons that were not using S&N products and converting them to S&N users.

84.     The statement of Mark Wise shows that S&N was trying to hide the fact that the true goal of the program was to increase business by making payments to new customers, not to obtain product feedback.

85.     On this call, Mr. Wise also stated how successful the program was when referencing the Polar stem, a product included in the VoC initiative.  It was clear that "success" meant increased product sales. The people that were on this call include: Steve Price (fellow Florida manager); Tom Troup   (fellow manager in Jacksonville, Florida); Bob McGrammery (Atlanta, Georgia); Chris Mason (manager in the Carolinas); Chip Parish (manager in Tennessee); and Ron Reagan (manager in the Carolinas).

86.     Numerous employees recognized the illegality of the program due to their continual compliance and AKS training.

87.     Unlike the usual VoC program, S&N targeted new customers and paid in excess of the market rate to complete a survey that often took less than five minutes to complete. In addition, S&N also focused on products that had been on the market for an extended period of time when, generally, VoC initiatives are conducted at the start of any new product.  Ex. C.

88.     Surgeons that were targeted by the VoC Initiative include but are not limited to Dr. Alan Valadie (Bradenton, FL); Dr. Mark Umlas (Miami, FL), Dr. Dean Cole (Orlando, FL); and Dr. Kenneth Sands (Viera, FL).   The agreements between the surgeons and S&N are memorialized in writing.

89.     The surveys consist of twelve to fifteen questions.  Ex. I.  S&N claims that the surveys take approximately thirty minutes to complete but, in reality, doctors have been typically able to finish the survey in three to five minutes.  S&N pays surgeons anywhere between $300.00 and $3,000.00 for completion of the survey, an amount that unreasonably exceeds market value by thousands of dollars.

90.     Not only is S&N solely targeting potential customers and paying them above market value for completion of surveys, the results of these surveys had minimal to no utility to the medical field whatsoever.   Laura Whitsitt, senior vice president of global research and innovation for S&N in Memphis, Tennessee, claims that VoC "isn't about asking customers for solutions, but is about understanding their needs."  Ex. J.  While these studies were ostensibly conducted to collect data for the production of scientific literature and product development, almost no articles of note have been published as a result.

91.     Because compliance with the Anti-Kickback Statute is a condition of payment under a federally-funded health care program, claims for reimbursement for procedures performed

by a physician who has received a kickback or at a hospital that has received a kickback from Defendant are not eligible for reimbursement by Medicare.

92.     Accordingly, kickback-tainted claims for reimbursement are false claims within the meaning of the Federal False Claims Act.

93.     Relator is aware of approximately $8-9 million worth of new business brought into S&N by the VoC program, which included around eighty surgeons nationwide and led to at least 1,500 surgeries utilizing S&N products.   This new business came from doctors, who did not previously use S&N products, choosing to use S&N products over competitors due to the VoC bribes.  This estimate is founded upon the fact that:

a.  S&N charges approximately $5,000 for a knee replacement and $15,000 for a hip replacement, of which both procedures use S&N products that were part of the VoC program.

b.  For the Redapt hip revision, Defendant paid at least twenty-eight surgeons to perform twelve surgeries each.   Approximately $3,000.00 was budgeted per surgeon, totaling $84,000 for all surgeons.

c.  Similarly, for the Journey II BCS knee, Defendant paid thirty surgeons to perform at least thirty surgeries each.  There was approximately a $150,000 budget set aside for this, averaging $250.00 per survey.

d.  For the Visionaire knee, Defendant paid twenty surgeons to perform twenty-five surgeries each.   There was approximately a $150,000 budget set aside for this, averaging $250.00 per survey.

e.  For the Polar Stem, Defendant paid five surgeons to perform a specified number of surgeries and had a budget allotted per survey.

f. The products themselves appear to have been paid for by the hospitals at a premium price; they were not given away for free or at a discounted rate. It is unclear at this time whether the hospitals were later reimbursed by Medicare for the cost of the products themselves.

g. Hospitals were reimbursed by Medicare for the surgeries performed by the targeted surgeons with the "tainted" S&N products. Relator estimates that in her region of southwest Florida, about eighty percent of the surgeries covered by the VoC program were reimbursed by Medicare because of the high percentage of elderly citizens in the area and the fact that several of the products involved in the VoC program were used in hip and knee replacements, a common procedure for elderly patients. Relator further estimates that the national percentage of Medicare-reimbursable surgeries was likely lower but not less than forty percent.

94. As a result of S&N's illegal kickback scheme, the taxpayers have been forced to bear the cost of excessive, unnecessary and unqualified medical care. At the same time, Medicare patients have been denied proper medical care, due to their physicians choosing products on the basis of bribes from S&N. As a result, the Medicare programs, along with other government healthcare programs, have incurred substantially increased costs.

95. Such costs include the Medicare reimbursement to the surgeon for the surgery based on the CPT code used for billing, which generally amounts to $1,800.00 to $2,500.00. In addition, Medicare reimburses the surgeon for office visits; numerous tests required prior to surgery; outpatient care; post visits after surgery; and possible rehabilitation therapy following surgery. Medicare reimburses the hospital based on the DRG, which is essentially a fee based on the type of surgery performed; expected length of stay; medications necessary; etc. Medicare also

provides reimbursements to the anesthesiologist, surgical assistants, and physical therapists. Further, pre-surgical evaluation consists of office visits; imaging; lab work; blood work; cultures; panel tests; walkers; crutches; and continuous passive motion machines are also reimbursable.

96.     Thus, the surveys offered by S&N via the VoC Initiative serve as an enticing type of kickback that induced doctors to exclusively use S&N products in return for a large payment given for participation in a bogus study at great cost to the United States Government.

## COUNT I
### Violation of the False Claims Act
31 U.S.C. § 3729(a)(1)-(2), (7)

97.     Plaintiff-Relator re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

98.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 *et seq*.

99.     As described above, Defendant has, through the use of illegal kickbacks, fraudulently induced physicians to use Smith & Nephew products exclusively.  Because the AKS is a critical provision, compliance with it is material to the government's treatment of claims for reimbursement.

100.     Through the acts described above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims, to the United States Government and the several states, in order to obtain government reimbursement for health care services provided under Medicare and other government health care programs.

101.     The United States and the several states,  unaware of the falsity or fraudulence of the statements, records or claims made or submitted by Defendant, its agents, and employees,

approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid, and has not recovered funds that would otherwise have been recovered.

102.    Had the United States and the several states known that the devices had been implanted because physicians had been paid kickbacks by S&N to do so, neither the United States nor the States would have provided reimbursement for these device implants.    As the United States and the States were unaware of the illegality of the claims, and in reliance on the accuracy and legality thereof, made payment upon the false or fraudulent claims, the United States and the States were damaged in an amount yet to be determined.

103.    The kickbacks described herein are strictly illegal and have had the direct effect of greatly increasing the amount of S&N devices procured and used by the government and under the auspices of government programs.  The kickbacks have had the indirect effect of increasing the amount of money spent by the federal government and the states for reimbursement of devices covered by government healthcare programs.  The payment of these kickbacks represents the inducement of federal payments through a pattern of fraudulent conduct and constitutes false claims within the meaning of 31 U.S.C. § 3729.

**COUNT II**
**Violation of the False Claims Act**
31 U.S.C. §3729(A)(3)

104.    Plaintiff-Relator re-alleges and incorporates by reference the allegations in the preceding paragraphs of this Complaint.

105.    S&N combined, conspired and agreed together with physicians and others to defraud the United States by knowingly causing false and illegal claims to be submitted to the United States for the purpose of having those claims paid and ultimately profiting from those false claims.

## COUNT III:
### Violation of the Arkansas Medicaid Fraud False Claims Act
A.C.A. § 20-77-901 et seq.

106.   Relator re-alleges and incorporates the allegations in paragraphs 1-82 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of S&N. S&N conducts business in the State of Arkansas. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Arkansas as well.

107.   This is a qui tam action brought by Relator and Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

108.   The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who:

- Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

- At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

109.   In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

- Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the Arkansas

27

Medicaid program.

110.     Smith & Nephew violated the Arkansas Medicaid Fraud False Claims Act §20-77-902(1)(2) & (7)(A) from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

111.     Smith & Nephew furthermore violated Arkansas Medicaid Fraud Claims Act§ 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to Arkansas from at least 2013 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti- Kickback Act and Stark Act Requirements, as described herein.

112.     Arkansas, by and through the Arkansas Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

113.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Arkansas in connection with Smith & Nephew's fraudulent and illegal practices.

114.     Had Arkansas known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

115.     As a result of Smith & Nephew's violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

116.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of herself and the State of Arkansas.

117.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

118.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF ARKANSAS:

- Three times the amount of actual damages which the State of Arkansas has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Arkansas;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

29

## COUNT IV

### Violation of the California False Claims Act
### Cal. Gov't Code § 12650 et seq.

119.    Relator re-alleges and incorporates the allegations in paragraphs 1-118 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.

120.    This is a qui tam action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 *et seq.*

121.    Cal. Gov't  Code§ 12651(a) provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the state of any political division thereof, a false claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision;

- Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

- Is a beneficiary of inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

122.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code§§ 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal.Welf. & Inst. Code§ 14107.2.

123.     Smith & Nephew violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal.Welf. & Inst. Code § 14107.2 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

124.     Smith & Nephew furthermore violated Cal. Gov't  Code § 12651(a)   and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2013 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2,  the Anti-Kickback Act and Stark Act Requirements, as described herein.

125.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

126.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Smith & Nephew's fraudulent and illegal practices.

127.     Had the State of California known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

128.     As a result of Smith & Nephew's violations of Cal. Gov't Code § 1265l(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

129.     Vivian Rice is  a  private  person  with  direct  and  independent knowledge of  the  allegations  of  this  Complaint,  who  has  brought  this  action pursuant  to  Cal. Gov't  Code  §  12652(c)  on  behalf  of  herself  and  the  State  of California.

130.     This Court  is  requested  to  accept supplemental  jurisdiction  over this related state  claim  as  it  is  predicated  upon  the  same  exact  facts  as  the  federal  claim,  and  merely asserts separate damages  to the State  of California  in the  operation  of its Medicaid  program.

131.     WHEREFORE,  Relator  respectfully  requests  this  Court  to  award  the following damages  to the following  parties  and against  Smith & Nephew:

To the STATE  OF CALIFORNIA:

- Three  times  the  amount  of  actual  damages  which  the  State  of California  has sustained  as a result  of Smith & Nephew's fraudulent  and  illegal  practices;

- A civil penalty  of  up to $10,000  for each false  claim  which  Smith & Nephew presented  or caused  to be presented  to the State  of California;

- Prejudgment  interest;  and

- All costs incurred  in bringing  this action.

To RELATOR:

- The maximum amount allowed pursuant to Cal. Gov't Code§ 12652 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

<u>**Count V**</u>
**Violation of the Delaware False and Reporting Claims Act**
6 Del. C.§ 1201 et seq.

132.    Relator re-alleges and incorporates the allegations in paragraphs 1-131 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Delaware. Upon information and belief, Smith & Nephew's actions described herein occurred in Delaware as well.

133.    This is a qui tam action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.

134.    6 Del. C.§ 1201 et seq. provides liability for any person who:

- Knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

- Knowingly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval;

- Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

- Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government.

135.   Further, 31 Del. C. § 1005 provides that:

- It shall be unlawful for any person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

136.   Smith & Nephew violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from 2001 to the present by its violation of federal and state laws, including 31 Del.C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

137.   The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

138.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Delaware in connection with Smith & Nephew's fraudulent and illegal practices.

139.    Had the State of Delaware known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

140.    As a result of Smith & Nephew's violations of 6 Del C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

141.    Smith & Nephew did not, within thirty days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

142.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 6 Del. C. § 1203(b) on behalf of herself and the State of Delaware.

143.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

144.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against Smith & Nephew:

To the STATE OF DELAWARE:

- Three times the amount of actual damages which the State of Delaware has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Smith & Nephew caused to be presented to the State of Delaware;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to 6 Del C.§ 1205, and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.


## Count VI
### Violation of the District of Columbia Procurement Reform Amendment Act
2-308.13 et seq.

145.    Relator re-alleges and incorporates the allegations in paragraphs 1-144 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the District of Columbia. Upon information and belief, Smith & Nephew's actions described herein occurred in the District of Columbia as well.

146. This is a qui tam action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

147. D.C. Code § 2-30814(a) provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval;

- Knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

- Conspires to defraud the District by getting a false claim allowed or paid by the District;

- Is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

148. In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following:

- Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or

- Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

149.     Smith & Nephew violated D.C. Code § 4-802(c) from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

150.     Smith & Nephew furthermore violated D. C. Code §   2-308.1 4(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2013 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

151.     The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

152.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Smith & Nephew's fraudulent and illegal practices.

153.     Had the District of Columbia known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

154.     As a result of Smith & Nephew's violations of D.C. Code § 2-308.14(a) the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

155.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of herself and the District of Columbia.

156.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

157.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the DISTRICT OF COLUMBIA:

- Three times the amount of actual damages which the District of Columbia has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the District of Columbia;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to D. C. Code§ 2-308.15(f) and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

## Count VII
### Violation of the Florida False Claims Act
68.081 et seq.

158.    Relator re-alleges and incorporates the allegations in paragraphs 1-157 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.  Smith & Nephew conducts business in the State of Florida. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Florida as well.

159.    This is a qui tam action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 et seq.

160.    West's F.S.A. § 68.082 provides liability for any person who —

- Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval.

- Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency.

- Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

161.    Smith & Nephew violated West's F.S.A. § 68.082 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

162.    Smith & Nephew furthermore violated West's F.S.A. § 68.082 and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

163.    The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

164.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Smith & Nephew's fraudulent and illegal practices.

165.    Had the State of Florida known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

166.    As a result of Smith & Nephew's violations of West's F.S.A. § 68.082 the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

167.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to West's F.S.A. § 68.083(2) on behalf of herself and the State of Florida.

168.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

169.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF FLORIDA:

- Three times the amount of actual damages which the State of Florida has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Florida;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to West's F.S.A. § 68.085 and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

**Count VIII**
**Violation of the Georgia State False Medicaid Claims Act**
Ga. Code Ann. § 49-4-168.1 *et seq.*

170.     Relator re-alleges and incorporates the allegations in paragraphs 1-169 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in  the State of Georgia. Upon information and belief, Smith & Nephew's  actions described herein occurred in Georgia as well.

171.     This is a qui tam action brought by Relator and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168  *et seq.*

171.     Ga. Code Ann. § 49-4-168.1 *et seq.* provides liability for any person who:

- Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

- Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

172.     Smith & Nephew violated Ga. Code Ann.§  49-4-168.1 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Georgia

43

from 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

173.    The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

174.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Smith & Nephew's fraudulent and illegal practices.

175.    Had the State of Georgia known that Smith & Nephew was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

176.    As a result of Smith & Nephew's violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

177.    Smith & Nephew did not, within thirty days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

178.     Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of herself and the State of Georgia.

179.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

180.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties against Smith & Nephew:

To the STATE OF GEORGIA:

- Three times the amount of actual damages which the State of Georgia has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which Smith & Nephew caused to be presented to the State of Georgia;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Ga. Code Ann.,§ 49-4-168.2(i), and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

<u>**Count IX**</u>
**Violation of the Hawaii False Claims Act**
Haw. Rev. Stat. § 661-21(a)

181.    Relator re-alleges and incorporates the allegations in paragraphs 1-180 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Hawaii.   Upon information and belief, Smith & Nephew's actions described herein occurred in Hawaii as well.

182.    This is a qui tam action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.

161.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

- Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or

- Is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

183.    Smith & Nephew violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii

from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

184.    The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

185.    Compliance with applicable Medicare, Medicaid and the various other federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Smith & Nephew's fraudulent and illegal practices.

186.    Had the State of Hawaii known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

187.    As a result of Smith & Nephew's violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

188.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of herself and the State of Hawaii.

189.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

190.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF HAWAII:

- Three times the amount of actual damages which the State of Hawaii has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Hawaii;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Haw. Rev. Stat.§ 661-27 and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

### <u>Count X</u>
### Violation of the Illinois Whistleblower Reward and Protection Act
### 740 ILCS 175 *et seq.*

191.    Relator re-alleges and incorporates the allegations in paragraphs 1-190 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Illinois.    Upon information and belief, Smith & Nephew's actions described herein occurred in Illinois as well.

192.    This is a qui tam action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175 *et seq.*

193.    740 ILCS 175/3(a) provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

- Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

194.    In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

195.    Smith & Nephew violated 305 ILCS 5/8A-3(b) from at least 2001 to the present by engaging in the fraudulent and illegal practices described herein.

49

196.    Smith & Nephew furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 2013 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

197.    The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

198.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Smith & Nephew's fraudulent and illegal practices.

199.    Had the State of Illinois known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

200.    As a result of Smith & Nephew's violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

201.    Vivian Rice is a private person with direct and independent knowledge of the allegation of this Complaint, who has brought this action pursuant to 740 ILCS 175/3(b) on behalf of herself and the State of Illinois.

202.   This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

203.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF ILLINOIS:

- Three times the amount of actual damages which the State of Illinois has sustained as a result of Smith & Nephew 's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Illinois;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## Count XI
### Violation of the Indiana False Claims and Whistleblower Protection Act
IC 5-11-5.5 *et seq.*

204.    Relator re-alleges and incorporates the allegations in paragraphs 1-203 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Indiana. Upon information and belief, Smith & Nephew's actions described herein occurred in Indiana as well.

205.    This is a qui tam action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5 *et seq.*

206.    IC 5-11-5.5-2 provides liability for any person who:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6).

207.    In addition, IC 12-15-24-1 and IC 12-15-24-2 prohibits the provision of a kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

208.    Smith & Nephew violated IC 12-15-24-1 and IC 12-15-24-2 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

209.    Smith & Nephew furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Indiana from at least 2013 to the present by its violation of federal and state laws, including IC 12-15-24-1 and IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

210.    The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

211.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Smith & Nephew's fraudulent and illegal practices.

212.    Had the State of Indiana known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

213.    As a result of Smith & Nephew's violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

214.    Vivian Rice is a private person with direct and independent knowledge of the allegation of this Complaint, who has brought this action pursuant to IC 5-11-5.5-4 on behalf of herself and the State of Indiana.

215.    This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

216.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF INDIANA:

- Three times the amount of actual damages which the State of Indiana has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- Prejudgment interest; and

- Additional costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## Count XII
### Violation of the Louisiana Medical Assistance Programs Integrity Law
La Rev. Stat. Ann § 437.1 *et seq.*

217.    Relator re-alleges and incorporates the allegations in paragraphs 1-216 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Louisiana. Upon information and belief of Smith & Nephew's actions described herein occurred in Louisiana as well.

218.    This is a qui tam action brought by Relator and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

219.    La. Rev. Stat. Ann. § 438.3 provides-

- No person shall knowingly present or cause to be presented a false or fraudulent claim;

- No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds;

- No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim;

220.   In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

221.   Smith & Nephew violated La. Rev. Stat. Ann§ 438.2(A) from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

222.   Smith & Nephew furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2013 to the present by its violation of federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

223.   The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

224.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Smith & Nephew's fraudulent and illegal practices.

225.   Had the State of Louisiana known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health

care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

226. As a result of Smith & Nephew's violations of La. Rev. Stat. Ann.§ 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

227. Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. § 439.1 (A) on behalf of herself and the State of Louisiana.

228. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

229. WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF LOUISIANA:

- Three times the amount of actual damages which the State of Louisiana has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Louisiana;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**Count XIII**
**Violation of the Massachusetts False Claims Act**
Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*

230.  Relator re-alleges and incorporates the allegations in paragraphs 1-229 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the Commonwealth of Massachusetts.  Upon information and belief, Smith & Nephew's actions described herein occurred in Massachusetts as well.

231.  This is a qui tam action brought by Relator and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) *et seq.*

232.  Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who:

- Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

- Conspires to defraud the Commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

- Is a beneficiary of an inadvertent submission of a false claim to the Commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the Commonwealth or political subdivision within a reasonable time after discovery of the false claim.

233.   In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

234.   Smith & Nephew violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

235.   Smith & Nephew furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 2013 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act and the Stark Act, as described herein.

236.   The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent

and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

237.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Smith & Nephew's fraudulent and illegal practices.

238.    Had the Commonwealth of Massachusetts known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

239.    As a result of Smith & Nephew's violations of Mass. Gen. Laws Ann. Chap. 12 § 5B the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.    Vivian Rice is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c(2)  on behalf of herself and the Commonwealth of Massachusetts.

241.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

242.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the COMMONWEALTH OF MASSACHUSETTS:

- Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the Commonwealth of Massachusetts;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## Count XIV
### Violation of the Michigan Medicaid False Claims Act
M.C.L.A. 400.601 *et seq.*

243.     Relator re-alleges and incorporates the allegations in paragraphs 1-242 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts

business in Michigan.   Upon information and belief, Smith & Nephew's actions described herein occurred in Michigan as well.

244.   This is a qui tam action brought by Relator and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 *et seq.*

245.   M.C.L.A. 400.607 provides liability for any person who, among other things:

- Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false. Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

246.   In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

247.   Smith & Nephew violated M.C.L.A. 400.604 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

248.   Smith & Nephew furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2013 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

249.     The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

250.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Smith & Nephew's fraudulent and illegal practices.

251.     Had the State of Michigan known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

252.     As a result of Smith & Nephew's violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

253.     Vivian Rice is a private person with direct and independent knowledge of the allegations of the Compliant, who has brought this action pursuant to M.C.L.A. 400.610a on behalf of herself and the State of Michigan.

254.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

255.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF MICHIGAN:

- All damages to which the State of Michigan is entitled pursuant to M.C.L.A. 400.612;

- Civil penalties for each false claim which Smith & Nephew caused to be presented to the State of Michigan;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## Count XV
## Violation of the Montana False Claims Act
MT ST 17-8-401 *et seq.*

256.    Relator re-alleges and incorporates the allegations in paragraphs 1-255 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in Montana.    Upon information and belief, Smith & Nephew's actions described herein occurred in Montana as well.

257.    This is a qui tam action brought by Relator and State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 *et seq.*

258.    MT ST 17-8-403 provides liability for any person who:

- knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval;

- knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity;

- conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

259.    In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

260.    Smith & Nephew violated MT ST 45-6-313 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

261.    Smith & Nephew furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Montana from at least 2013 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

262.    The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

263.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Montana in connection with Smith & Nephew's fraudulent and illegal practices.

264.    Had the State of Montana known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

265.    As a result of Smith & Nephew's violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

266.    Vivian Rice is a private person with direct and independent knowledge of the allegations of the Complaint, who has brought this action pursuant to MT ST 17-8-406 on behalf of herself and the State of Montana.

267.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

268.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF MONTANA:

- Three times the amount of actual damages which the State of Montana has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Montana;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**Count XVI**
**Violation of the Nevada False Claims Act**
N.R.S. § 357.010 *et. seq*

269.    Relator re-alleges and incorporates the allegations in paragraphs 1-268 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.  Smith & Nephew conducts business in the State of Nevada.   Upon information and belief, Smith & Nephew's actions described herein occurred in Nevada as well.

270.    This is a qui tam action brought by Relator  and the State of Nevada to recover  treble  damages  and  civil  penalties  under  the  Nevada  False  Claims  Act, N.R.S. § 357.010 *et. seq.*

271.    N.R.S. § 357.040(1) provides liability for any person who:

- Knowingly presents or causes to be presented a false claim for payment or approval;

- Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

- Conspires to defraud by obtaining allowance or payment of a false claim;

- Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

272. In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

273. Smith & Nephew violated N.R.S. § 422.560 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

274. Smith & Nephew furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2013 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

275. The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

276. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Smith & Nephew's fraudulent and illegal practices.

277. Had the State of Nevada known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

278.   As a result of Smith & Nephew's violations of N.R.S.  § 357.040(1)  the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

279.   Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.R.S. § 357.080(1) on behalf of herself and the State of Nevada.

280.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicted upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

281.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NEVADA:

- Three times the amount of actual damages which the State of Nevada has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Nevada;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR

- The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

## Count XVII
### Violation of the New Hampshire False Claims Act
N.H. Rev. Stat.§ 167:61-b

282.    Relator re-alleges and incorporates the allegations in paragraphs 1-281 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint  was a nationwide practice of Smith & Nephew. Smith  &  Nephew conducts business in New Hampshire.  Upon information and belief, Smith & Nephew's actions described herein occurred in New Hampshire as well.

283.    This  is  a  qui  tam  action  brought  by  Relator  and  State  of  New Hampshire for treble damages and penalties under New Hampshire False Claims Act, N.H. Rev. Stat.§ 167:61-b *et seq.*

284.    N.H. Rev. Stat.§ 167:61-b provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the department, a false or fraudulent claim for payment or approval.

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the department.

- Conspires to defraud the department by getting a false or fraudulent claim allowed or paid.

285.    Smith  &  Nephew  violated  N.H. Rev. Stat.  §  1 67:61-b  and  knowingly  caused hundreds  of  thousands  of  false  claims  to  be  made,  used  and  presented  to  the  State  of  New

Hampshire from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act as described herein.

286.   The State of New Hampshire, by and through the New Hampshire Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

287.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Hampshire in connection with Smith & Nephew's fraudulent and illegal practices.

288.   Had the State of New Hampshire known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

289.   As a result of Smith & Nephew's violations of N.H. Rev. Stat.§ 167:61-b the State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

290.   Vivian Rice is a private person with direct and independent knowledge of the allegations of the Complaint, who has brought this action pursuant to N.H. Rev. Stat. § 167:61-c on behalf of herself and the State of New Hampshire.

291.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

292.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NEW HAMPSHIRE:

- Three times the amount of actual damages which that State of New Hampshire has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of New Hampshire;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to N.H. Rev. Stat.§ 167:61-e and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**Count XVIII**
**Violation of the New Jersey False Claims Act**
N.J.S.A. 2A:32C-3

293.    Relator re-alleges and incorporates the allegations in paragraphs 1-292 as if fully set forth herein.  Additionally, Smith & Nephew conducts business in New Jersey. Upon information and belief, Smith & Nephew's actions described herein occurred in New Jersey as well.

294.    This is a qui tam action brought by Relator and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.

295.    N.J.S.A. 2A:32C-3 provides liability for any person who:

- Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

- Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

296.    In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program, or the furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

297.    Smith & Nephew violated N.J.S.A. 30:4D-17 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

298.    Smith & Nephew furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New Jersey from at least 2013 to the present by its violation of federal and state laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as described herein.

299.    The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

300.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Smith & Nephew's fraudulent and illegal practices.

301.    Had the State of New Jersey known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

302.    As a result of Smith & Nephew's violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

303.    Vivian Rice is a private person with direct and independent knowledge of the allegations of the Complaint, who has brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of herself and the State of New Jersey.

304.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

305.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NEW JERSEY:

- Three times the amount of actual damages which the State of New Jersey has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of New Jersey;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

**Count XIX**
**Violation of the New Mexico Medicaid False Claims Act**
**and the Fraud Against Taxpayers Act**
N. M. S. A. 1978, § 27-14-1 *et seq.*

306.    Relator re-alleges and incorporates the allegations in paragraphs 1-305 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of New Mexico. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of New Mexico as well.

307.    This is a qui tam action brought by Relator and the State of New Mexico  to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M.S.A. 1978, § 27-14-1 *et seq.* and the New Mexico Fraud Against Taxpayers Act, N.M.S.A. 1978, § 44-9-1 *et seq.*

308.    N.M.S.A. 1978, § 27-14-4 provides liability for any person who-

- Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program.

- Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false.

- Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

309.    N.M.S.A. 1978 § 44-9-3 provides liability for any person who:

- Knowingly presents, or causes to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

- Knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment of a false or fraudulent claim;

- Conspires to defraud the state by obtaining approval or payment of a false or fraudulent claim;

- Conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

310.    Smith & Nephew violated N.M.S.A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

311.    Smith & Nephew furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

312.    The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Smith &

Nephew's fraudulent and illegal practices, paid the claims submitted by healthcare providers and third party payers in connection therewith.

313.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Mexico in connection with Smith & Nephew's fraudulent and illegal practices.

314.     Had the State of New Mexico known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

315.     As a result of Smith & Nephew's violations of N.M.S.A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

316.     Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.M.S.A. 1978, § 27-14-7 and N.M.S.A. 1978, § 44-9-5 on behalf of herself and the State of New Mexico.

317.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

318.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NEW MEXICO:

- Three times the amount of actual damages which the State of New Mexico has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of New Mexico;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to N.M.S.A. 1978, § 27-14-9 and N.M.S.A. 1978, § 44-9-7 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

## Count XX
### Violation of the New York False Claims Act
McKinney's State Finance Law § 187 *et seq.*

319.   Relator re-alleges and incorporates the allegations in paragraphs 1-318 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of New York. Upon information and belief, Smith & Nephew's actions described herein occurred in New York as well.

79

320.    This is a qui tam action brought by Relator and the State of New York for treble damages and penalties under New York False Claims Act, McKinney's State Finance Law § 187 *et seq.*

321.    McKinney's State Finance Law § 189 provides liability for any person who:

- Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government;

- Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

322.    Smith & Nephew violated §189 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

323.    Smith & Nephew furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of New York from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

324.    The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

325.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New York in connection with Smith & Nephew's fraudulent and illegal practices.

326.    Had the State of New York known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

327.    As a result of Smith & Nephew's violations of § 189 of the State of New York laws has been damaged in an amount far in excess of millions of dollars exclusive of interest.

328.    Vivian Rice is a private person with direct and independent knowledge of the allegations of the Complaint, who has brought this action pursuant to McKinney's State Finance Law § 190(2) on behalf of herself and the State of New York.

329.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

330.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NEW YORK:

- Three times the amount of actual damages which the State of New York has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of New York;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to McKinney's State Finance Law§190(6) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this Court deems equitable and just.

### Count XXI
### Violation of the Oklahoma Medicaid False Claims Act
63 Okl. St. Ann. § 5053 *et seq.*

331.     Relator re-alleges and incorporates the allegations in paragraphs 1-330 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Oklahoma. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Oklahoma as well.

332.     This is a qui tam action brought by Relator and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 *et seq.*

333.     63 Okl. St. Ann. § 5053.1 provides liability for any person who-

- Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

- Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

334.    In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

335.    Smith & Nephew violated 56 Okl. St. Ann. § 1005 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

336.    Smith & Nephew furthermore violated 63 Okl. St. Ann. § 5053.1 and knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2013 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

337.    The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

338.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Oklahoma in connection with Smith & Nephew's fraudulent and illegal practices.

339.    Had the State of Oklahoma known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

340.    As a result of Smith & Nephew's violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

341.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of herself and the State of Oklahoma.

342.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

343.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF OKLAHOMA:

- Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Oklahoma;

- Prejudgment interest;  and

- All costs incurred in bringing  this action.

To RELATOR:

- The  maximum  amount  allowed  pursuant 63 Okl. St. Ann. § 5053.4 and /or any other applicable provision  of law;

- Reimbursement for reasonable expenses which  Relator  incurred in connection with  this action;

- An award of reasonable  attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

### Count XXII
### Violation of the Rhode Island False Claims Act
Gen. Laws  1956, § 9-1.1-1 *et seq.*

344.    Relator re-alleges and  incorporates the allegations in  paragraphs 1-343 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Rhode Island.  Upon information and belief, Smith & Nephew's action described herein occurred  in the State of Rhode Island as well.

345.    This  is  a  qui  tam  action  brought  by  Relator  and  the  State  of  Rhode Island  to recover  treble  damages  and  civil  penalties  under  the  Rhode  Island  False Claims Act, Gen. Laws  1956, § 9-1.1-1 *et seq.*

346.    Gen. Laws  1956, § 9-1.1-3 provides  liability for any person who-

- knowingly  presents, or causes  to be presented, to an officer  or employee of the state or a member of the guard a false or fraudulent claim for payment  or approval;

85

- knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

- conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

347. In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt, offer, or payment of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

348. Smith & Nephew violated Gen. Laws 1956, § 40-8.2-3 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

349. Smith & Nephew furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used and presented to the State of Rhode Island from at least 2013 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

350. The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

351. Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also

an express condition of payment of claims submitted to the State of Rhode Island in connection with Smith & Nephew's fraudulent and illegal practices.

352.   Had the State of Rhode Island known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

353.   As a result of Smith & Nephew's violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

354.   Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Gen. Laws 1956, § 9-l.1-4(b) on behalf of herself and the State of Rhode Island.

355.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

356.   WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF RHODE ISLAND:

- Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Rhode Island;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Gen. Laws 1956, § 9-1.1-4(d) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

### Count XXIII
### Violation of the Tennessee False Claims Act
Tenn. Code Ann.§ 71-5-181 *et seq.*

357.   Relator re-alleges and incorporates the allegations in paragraphs 1-356 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the State of Tennessee. Upon information and belief, Smith & Nephew's actions described herein occurred in Tennessee as well.

358.   This is a qui tam action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann.§ 71-5-181 *et seq.*

88

359.    Section 71-5-182(a)(l) provides liability for any person who:

- Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

- Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid or approved by the state knowing such record or statement is false;

- Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

360.    Smith & Nephew violated Tenn. Code Ann. § 71-5-182(a)(l) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

361.    The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

362.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Smith & Nephew's fraudulent and illegal practices.

363.    Had the State of Tennessee known that Smith & Nephew violated the federal and state laws cited herein, it would not have paid the claims submitted by health care

providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

364.    As a result of Smith & Nephew's violations of Tenn. Code Ann. § 71-5-182(a)(l), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

365.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(l) on behalf of herself and the State of Tennessee.

366.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

367.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF TENNESSEE:

- Three times the amount of actual damages which the State of Tennessee has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Tennessee;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Tenn. Code Ann. §71-5-183(c) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

**Count XXIV**
**Violation of the Texas False Claims Act**
V.T.C.A. Hum. Res. Code§ 36.001 *et seq.*

368.    Relator re-alleges and incorporates the allegations in paragraphs 1-367 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.    Smith & Nephew conducts business in the State of Texas.    Smith & Nephew's actions described herein occurred in Texas as well.

369.    This is a qui tam action brought by Relator and the State of Texas to recover double damages and civil penalties under the Texas False Claims Act, V.T.C.A. Hum. Res. Code§ 36.001 *et seq.*

370.    V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who:

- Knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

- Knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

- Knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

- Except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

- Except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

- Knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;

- Knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

371.   Smith & Nephew violated V.T.C.A. Hum. Res. Code § 36.001 et seq. and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas from at least 2013 to the present by its violation of federal and state laws, including, the Anti-Kickback Act and the Stark Act, as described herein.

372.   The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

373.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Smith & Nephew's fraudulent and illegal practices.

374.   Had the State of Texas known that Smith & Nephew was violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

375.   As a result of Smith & Nephew's violations of V.T.C.A. Hum. Res. Code § 36.001 et seq., the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

376.     Smith & Nephew did not, within thirty days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

377.     Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of herself and the State of Texas.

378.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

379.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF TEXAS:

- Damages at two times the value of any payment or monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful acts set forth above, as provided by the Texas Human Resources Code § 36.052(a)(l) & (4) Civil penalties of $15,000 for each and every unlawful act set forth above that resulted in injury to a person younger than 18 years of age, as provided by the Texas Human Resources Code § 36.052(3)(A) Pre- and post-judgment interest, Tex. Hum. Res. Code§ 36.052(a)(2).

94

To RELATOR:

- The maximum amount allowed pursuant to V.T.C.A. Hum Res. Code§ 36.110(a), and/or any other applicable provision of law;

- Reimbursement for reasonable expenses and costs which Relator incurred in connection with this action, Tex Hum Res. Code§§ 36.007 & 36.110(c);

- Reasonable attorneys' fees which the Relator necessarily incurred in bringing and pressing this case, Tex Hum Res. Code§§ 36.007 & 36.110(c); and

- Such further relief as this Court deems equitable and just.

### Count XXV
### Violation of the Virginia Fraud Against Taxpayers Act
Va. Code Ann.§ 8.01-216.1 *et seq.*

380.    Relator re-alleges and incorporates the allegations in paragraphs 1-379 as if fully set forth herein. Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conducts business in the Commonwealth of Virginia. Upon information and belief, Smith & Nephew's actions described herein occurred in the Commonwealth of Virginia as well.

381.    This is a qui tam action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann.§ 8.01-216.1 et seq.

382.    Va. Code Ann. § 8.01-216.3 provides liability for any person who:

- Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval;

95

- Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

383.   Smith & Nephew violated Va. Code Ann. § 8.01-216.3 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

384.   Smith & Nephew furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

385.   The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

386.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia is connection with Smith & Nephew's fraudulent and illegal practices.

387.   Had  the Commonwealth of Virginia known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

388.    As a result of Smith & Nephew's violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

389.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of herself and the Commonwealth of Virginia.

390.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

391.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the COMMONWEALTH OF VIRGINIA:

- Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the Commonwealth of Virginia;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Va. Code Ann.§ 8.01-216.7 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

**Count XXVI**
**Violation of the Wisconsin False Claims for Medical Assistance Act**
**W.S.A. 20.931 *et seq.***

392.    Relator re-alleges and incorporates the allegations in paragraphs 1-391 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.  Smith & Nephew conducts business in the State of Wisconsin. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Wisconsin as well.

393.    This is a qui tam action brought by Relator and the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims for Medical Assistance Act, W.S.A. 20.931 *et seq.*

394.    W.S.A. 20.931(2) provides liability for any person who-

- Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

- Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

- Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

395.   In addition, W.S.A. 49.49(2) prohibits solicitation or receipt of any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any Wisconsin medical assistance program.

396.   Smith & Nephew violated W.S.A. 49.49(2) from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

397.   Smith & Nephew furthermore violated W.S.A. 20.931(2) and knowingly caused thousands of false claims to be made, used and presented to the State of Wisconsin from at least 2013 to the present by its violation of federal and state laws, including W.S.A. 49.49(2), the Anti-Kickback Act, and Stark Act, as described herein.

398.   The State of Wisconsin, by and through the State of Wisconsin Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

399.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Wisconsin in connection with Smith & Nephew's fraudulent and illegal practices.

400.    Had the State of Wisconsin known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

401.    As a result of Smith & Nephew's violations of W.S.A. 20.931(2) the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

402.    Vivian Rice is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to W.S.A. 20.931(5) on behalf of herself and the State of Wisconsin.

403.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

404.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF WISCONSIN:

- Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Wisconsin;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant W.S.A. 20.931(11) and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

### Count XXVII
### Violation of the Colorado Medicaid False Claims Act
Colorado Revised Statutes§ 25.5-4-303.5. *et seq.*

405.    Relator re-alleges and incorporates the allegations in paragraphs 1-404 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.   Smith & Nephew conducts business in the State of Colorado.   Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Colorado as well.

406.    This is a qui tam action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes§ 25.5-4-303.5. *et seq.*

407.    Colorado Revised Statutes § 25.5-4-305. provides liability for any person who-

- Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used a false record or statement material to a raise or fraudulent claim;

- Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

- Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state makes or delivers the receipt without completely knowing that the information on the receipt is true;

- Knowingly buys or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

- Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act;

- Conspires to commit a violation of paragraphs (a) to (f) of this subsection.

408.   Smith & Nephew violated Colorado Revised Statutes§ 25.5-4-305 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

409.   Smith & Nephew furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

410.   The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

411.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in connection with Smith & Nephew's fraudulent and illegal practices.

412.   Had the State of Colorado known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

413.   As a result of Smith & Nephew's violations of Colorado Revised Statutes § 25.5-4-305 the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

414.    Relator Vivian Rice, has direct and independent knowledge of the allegations of this Complaint, has brought this action pursuant to Colorado Revised Statutes§ 25.5-4-306(2) on behalf of herself and the State of Colorado.

415.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

416.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF COLORADO:

- Three times the amount of actual damages which the State of Colorado has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Smith & Nephew caused to be presented to the State of Colorado;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

**Count XXVIII**
**Violation of the Connecticut False Claims Act for Medical Assistance Programs**
Connecticut General Statutes §17b-301b.  *et seq.*

417.    Relator re-alleges and incorporates the allegations in paragraphs 1-416 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.   Smith & Nephew conducts business in the State of Connecticut.  Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Connecticut as well.

418.    This is a qui tam action brought by Relator and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, Connecticut General Statutes §17b-301b. *et seq.*

419.    Connecticut General Statutes § 17b-30 1b. provides liability for any person who-

- Knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

- Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

- Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

420.     Smith & Nephew violated Connecticut General Statutes§ 17b-301b from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

421.     Smith & Nephew furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

422.     The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

423.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Smith & Nephew's fraudulent and illegal practices.

424.     Had the State of Connecticut known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

425.     As a result of Smith & Nephew's violations of Connecticut General Statutes § 17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

426.    Relator Vivian Rice has direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Connecticut General Statutes § 17b-301d on behalf of herself and the State of Connecticut.

427.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

428.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF CONNECTICUT:

- Three times the amount of actual damages which the State of Connecticut has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Connecticut;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Connecticut General Statutes §17b-301 and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

107

- Such further relief as this court deems equitable and just.

### Count XXIX
**Violation of the Maryland Medicaid False Claims Against State Health Plans
and State Health Programs Act**
Annotated Code of Maryland§ 2-601 *et seq.*

429.    Relator re-alleges and incorporates the allegations in paragraphs 1-428 as if fully set forth herein.  Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.  Smith & Nephew conduct business in the State of Maryland.  Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Maryland as well.

430.    This is a qui tam action brought by Relator and the State of Maryland to recover treble damages and civil penalties under the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland§ 2-601 *et seq.*

431.    Annotated Code of Maryland § 2-602 provides liability for any person who:

- Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used a false record or statement material to a raise or fraudulent claim;

- Conspires to commit a violation under this subtitle·

- Has possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly delivers or causes to be delivered to the State less than all of that money or other property;

108

- Knowingly makes any other false or fraudulent claim against a State health plan or a State health program.

432.    Smith & Nephew violated the Annotated Code of Maryland § 2-602 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

433.    Smith & Nephew furthermore violated the Annotated Code of Maryland § 2-602 and knowingly caused thousands of false claims to be made, used and presented to the State of Maryland from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

434.    The State of Maryland, by and through the State of Maryland Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

435.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Maryland in connection with Smith & Nephew's fraudulent and illegal practices.

436.    Had the State of Maryland known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

437.    As a result of Smith & Nephew's violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

438.    Relator Vivian Rice has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Annotated Code of Maryland § 2-604 on behalf of herself and the State of Maryland.

439.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program

440.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF MARYLAND:

- Three times the amount of actual damages which the State of Maryland has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Smith & Nephew caused to be presented to the State of Maryland;

- Prejudgment interest; and

- All costs incurred in bringing this action.


To RELATOR:

- The maximum amount allowed pursuant to the Annotated Code of Maryland§ 2-605 and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

110

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

### Count XXX
**Violation of the Washington Medicaid Fraud Act**
Washington Revised Code §  74 66-005 *et seq.*

441.    Relator re-alleges and incorporates the allegations in paragraphs 1-440 as if fully set forth herein.    Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew.  Smith & Nephew conduct business in the State of Washington. Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Washington as well.

442.    This is a qui tam action brought by Relator and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code §  74 66-005 *et seq.*

443.    Washington Revised Code§ 74 66-020 provides liability for any person who-

- Knowingly presents,  or causes to be presented, a false or fraudulent claim for payment or approval;

- Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- Conspires to commit one or more of the violations in this subsection.

444.    Smith & Nephew violated Washington Revised Code§ 74 66-020 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

445.    Smith & Nephew furthermore violated Washington Revised Code§ 74 66-020 and knowingly caused thousands of false claims to be made; used and presented to the State of

Washington from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

446.    The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

447.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Smith & Nephew's fraudulent and illegal practices.

448.    Had the State of Washington known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

449.    As a result of Smith & Nephew's  violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

450.    Relator Vivian Rice has direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of herself and the State of Washington.

451.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

452.     WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF WASHINGTON:

- Three times the amount of actual damages which the State of Washington has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Smith & Nephew caused to be presented to the State of Washington;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

## Count XXXI
### Violation of the North Carolina False Claims Act
North Carolina General Statutes § 1-605 *et seq.*

453.     Relator re-alleges and incorporates the allegations in paragraphs 1-452 as if fully set forth herein. Additionally, Relator states that the course of conduct described in

this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conduct business in the State of North Carolina.   Upon information and belief, Smith & Nephew's actions described herein occurred in the State of North Carolina as well.

454.   This is a qui tam action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, North Carolina General Statutes § 1-605 *et seq*.

455.   North Carolina General Statutes § 1-607 provides liability for any person who:

- Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval

- Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- Conspires to commit a violation of subdivisions of this section.

456.   Smith & Nephew violated North Carolina General Statutes § 1-607 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

457.   Smith & Nephew furthermore violated North Carolina General Statutes § 1-607 and knowingly caused thousands of false claims to be made, used and presented to the State of North Carolina from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

458.   The State of North Carolina, by and through the State of North Carolina Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third party payers in connection therewith.

459.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Smith & Nephew's fraudulent and illegal practices.

460.    Had the State of North Carolina known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

461.    As a result of Smith & Nephew's violations of North Carolina General Statutes § 1-607 the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

462.    Relator Vivian Rice has direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to North Carolina General Statutes § 1-608 on behalf of herself and the State of North Carolina.

463.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

464.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF NORTH CAROLINA:

- Three times the amount of actual damages which the State of North Carolina has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Smith & Nephew caused to be presented to the State of North Carolina;

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to North Carolina General Statutes § 1-610 and /or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

### Count XXXII
### Violation of the Minnesota False Claims Act
Minnesota Statutes § 15C.02 *et seq.*

465.    Relator re-alleges and incorporates the allegations in paragraphs 1-464 as if fully set forth herein.   Additionally, Relator states that the course of conduct described in this Complaint was a nationwide practice of Smith & Nephew. Smith & Nephew conduct business in the State of Minnesota.   Upon information and belief, Smith & Nephew's actions described herein occurred in the State of Minnesota as well.

466.    This is a qui tam action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minnesota Statutes § 15C.02 *et seq.*

467.   Minnesota Statutes § 15C.02 provides liability for any person who-

- Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

- Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false and fraudulent claim paid or approved by the state or a political subdivision;

- Knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim.

468.   Smith & Nephew violated Minnesota Statutes § 15C.02 from at least 2013 to the present by engaging in the fraudulent and illegal practices described herein.

469.   Smith & Nephew furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2013 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

470.   The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Smith & Nephew's fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

471.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express

condition of payment of claims submitted to the State of Minnesota in connection with Smith & Nephew's fraudulent and illegal practices.

472.    Had the State of Minnesota known that Smith & Nephew was violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third party payers in connection with Smith & Nephew's fraudulent and illegal practices.

473.    As a result of Smith & Nephew's violations of Minnesota Statutes § 15C.02 the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

474.    Relator Vivian Rice has direct and independent knowledge of the allegations of this Complaint, and has brought this action pursuant to Minnesota Statutes § 15C.05 on behalf of herself and the State of Minnesota.

475.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

476.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Smith & Nephew:

To the STATE OF MINNESOTA:

- Three times the amount of actual damages which the State of Minnesota has sustained as a result of Smith & Nephew's fraudulent and illegal practices;

- A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Smith & Nephew caused to be presented to the State of Minnesota;

118

- Prejudgment interest; and

- All costs incurred in bringing this action.

To RELATOR:

- The maximum amount allowed pursuant to Minnesota Statutes § 15C.l2 and/or any other applicable provision of law;

- Reimbursement for reasonable expenses which Relator incurred in connection with this action;

- An award of reasonable attorneys' fees and costs; and

- Such further relief as this court deems equitable and just.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against the Defendant as follows:

1. That Defendant cease and desist from violating 31 U.S.C. §3729 *et seq.*;

2. That this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3. That Plaintiff-Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4. That Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. That the United States and Plaintiff recover such other and further relief as the Court deems just and proper.

119

## VIII.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby

demands a trial by jury.


Respectfully submitted,


**SANFORD HEISLER KIMPEL, LLP**

*H Vincent McKnight (MRK)*

H Vincent McKnight
M.D. Bar No. 14749
David W. Sanford
D.C. Bar No. 457933
Marissa Abraham
D.C. Bar No. 1022343
1666 Connecticut Avenue, NW, Suite 300
Washington, D.C.  20009
Telephone: (202) 499-5200
Fax:  (202) 499-5199


Ross B. Brooks
N.Y. Bar No. 922122
**SANFORD HEISLER KIMPEL**
1350 Avenue of the Americas 31st Floor
New York, NY 10019
Tel: 646-402-5650
Fax: 646-402-5651


Grant Morris
D.C. Bar No. 926253
**LAW OFFICES OF GRANT MORRIS**
1666 Connecticut Ave., NW, Suite 300
Washington, D.C. 20009
Telephone: (202) 499-5210
Fax: (202) 499-5199


**Counsel for Plaintiffs/Relators**